## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DOROTHY MCMILLIAN, individually and
on behalf of all others similarly situated,

:
: No **06 CV 3995**
:
Plaintiff,                                  :
                                            :
    v.                                      :
                                            :
BAUSCH & LOMB INCORPORATED,                 :
FRANKLIN E. AGNEW, ALAN M.                  :      **CLASS ACTION COMPLAINT**
BENNETT, PAUL A. FRIEDMAN,                  :
JONATHAN S. LINEN, RUTH R.                  :
MCMULLEN, JOHN R. PURCELL, LINDA            :
JOHNSON RICE, DOMENICO DE SOLE,             :
WILLIAM H. WALTRIP, BARRY W.                :
WILSON, KENNETH L. WOLFE, RONALD            :
L. ZARELLA. THE BAUSCH & LOMB               :
EMPLOYEE BENEFITS                           :
ADMINISTRATION, DAVID NACHBAR               :
JURIJ Z. KUSHNER and JOHN DOES 1-30         :
                                            :
            Defendants.                     :
                                            :



RECEIVED
MAY 2 5 2006
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Dorothy McMillian ("Plaintiff"), individually, on behalf of the Bausch & Lomb

401(k) Account Plan (the "Plan") and on behalf of a class of similarly situated participants in the

Plan (the "Participants"), by her attorneys, alleges the following for her Complaint

("Complaint"):

## I. NATURE OF THE ACTION AND SUMMARY OF CLAIMS

1.      Plaintiff, a Participant in the Plan, brings this action against Bausch & Lomb

Incorporated ("Bausch & Lomb" or the "Company") and others individually, derivatively on

behalf of the Plan for Plan-wide relief and on behalf of a class of the Plan and all Participants in

the Plan for whose individual accounts the Plan invested in the Bausch & Lomb Incorporated

Stock Fund (the "Fund") between May 25, 2000 and May 15, 2006 (the "Class Period").

Plaintiff brings this action on behalf of both the Plan and the Plan's Participants and

beneficiaries pursuant to § 502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2)and (3).

2.      As more fully set forth below, Defendants breached their fiduciary duties owed to the Plan and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550.  As a result of these breaches, Defendants are liable to the Plan for all losses resulting from each such breach of fiduciary duty.  Plaintiff also seeks equitable relief.

3.      Plaintiff's claims arise out of the marketing and sale of the Company's ReNu® with MoistureLoc® Multi-Purpose Solution ("ReNu") product.  In particular, the Company failed to disclose serious health problems caused by the use of the ReNu product, including the potential for eye infections and blindness.  Despite having been put on notice of these health problems, the Company remained silent and continued to tout ReNu.  Ultimately, given the seriousness of the health problems created by ReNu, the Company halted all sales of ReNu.

4.      Plaintiff's claims also arise out of financial irregularities during the Class Period wherein the Company and its senior executives reported false information about Bausch & Lomb's financial results, and failed to disclose material adverse information about the true nature of the Company's revenues, the lack of adequate internal controls and the underpayment of taxes resulting in tens of millions of dollars in penalties.

5.      Collectively, these improprieties caused the Company to suspend all global sales of ReNu and restate its financial results from 2000 through the first half of 2005.  These improper activities artificially inflated the value of Fund and Bausch & Lomb common stock shares by as much as 50%.  Yet, throughout the Class Period, while the Plan continued to invest in the Fund and the Fund continued to invest in Bausch & Lomb stock, the Company's top

officers and directors sold their holdings of artificially inflated Company stock for personal gains of over $29 million.

6.      Plaintiff alleges that it was imprudent for the Plan to invest in the Fund and for the Fund to invest in Bausch & Lomb stock because the prices of the Fund and the Company stock were artificially inflated by these improprieties.  Plaintiff also alleges that Defendants breached their fiduciary duties by negligently failing to disclose material information necessary for Participants to make informed decisions concerning the Plan's assets and benefits and investing in the Fund.  Finally, Plaintiff alleges that those Defendants who had a duty to appoint and monitor those fiduciaries with authority or control over Plan assets breached their duty to appoint and monitor.

## II.  JURISDICTION AND VENUE

7.      Plaintiff's claims arise under and pursuant to ERISA § 502, 29 USC § 1132.

8.      This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is the district where the Plan was administered, where the breaches took place and where one or more defendants reside or may be found.

## III.  THE PARTIES

### Plaintiff

10.     Plaintiff Dorothy McMillian is a resident of the State of South Carolina, Spartanburg County.  Plaintiff is a former employee of Bausch & Lomb and a Participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

-3-

**Defendants**

11.     Defendant Bausch & Lomb Incorporated ("Bausch & Lomb" or the "Company") is a New York corporation with its principal place of business located at One Bausch & Lomb Place, Rochester, New York 14604-2701.   Bausch & Lomb engages in the development, manufacture, and marketing of eye health products. Bausch & Lomb is the Plan's sponsor and a fiduciary of the Plan.

12.     The Board of Directors of the Company had the duty to appoint and monitor the members of the Employee Benefits Administration Committee.   The Board as an entity, and each of the following who were members of the Board of Directors during some or all of the Class Period (collectively the "Director Defendants") are named as Defendants: Franklin E. Agnew, Alan M. Bennett, Paul A. Friedman, Jonathan S. Linen, Ruth R. McMullen, John R. Purcell, Linda Johnson Rice, Domenico De Sole, William H. Waltrip, Barry W. Wilson, Kenneth L. Wolfe and Ronald L. Zarella.

13.     Defendant Bausch & Lomb Incorporated Employee Benefits Administration Committee (the "Committee") is designated as the Plan's administrator and is, along with its individual members, a fiduciary of the Plan.

14.     Defendant David Nachbar ("Nachbar") was Chairman of the Committee. Nachbar was also the Senior Vice President, Human Resources at Bausch & Lomb.

15.     Defendant Jurij Z. Kushner ("Kushner") was a Member of the Committee. Kushner was also Vice President and Controller of Bausch & Lomb.

16.     Defendants John Does 1-30 are members of the Committee and, therefore, are fiduciaries of the Plan and/or exercised discretionary authority over the Plan and/or the Fund. Upon information and belief, these other members of the Committee were senior officers and

employees with the Company who served on the Committee without additional compensation in the ordinary course of their employment.  As a result of their senior positions with the Company, they knew or should have known all of the facts alleged herein. (Hereinafter, the Committee, Nachbar, Kushner  and John Does 1-30 are referred to as the "Committee Defendants").

### IV.  CLASS ACTION ALLEGATIONS

17.    Plaintiff brings this action in part as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of the Plan and all Participants in the Plan for whose individual accounts the Plan invested in shares of the Fund between May 25, 2006 and May 15, 2006 (the "Class").

18.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class and that many or all of these were Participants for whose accounts the Plan held interests in the Fund. For example, the Plan's 2004 Form 5500 states that the Plan had 6,625 Participants.

19.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.     whether Defendants were fiduciaries to the Plan and/or the Participants;

      b.     whether Defendants breached their fiduciary duties;

      c.     whether the Plan and the Participants were injured by such breaches; and

      d.     whether the Class is entitled to recovery or injunctive relief.

20.     Plaintiff's claims are typical of the claims of the members of the Class, as Plaintiff and members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained competent counsel.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

22.     Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

23.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable.  Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V. <u>DESCRIPTION OF THE PLAN</u>

24.     The Bausch & Lomb 401(k) Account Plan (the "Plan") is an employee benefit Plan within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. § 1002(3) and 1002(2)(A). The purpose of the Plan was to provide retirement benefits to Plan Participants.

25.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's account.   Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

26.     The Plan is a voluntary contribution Plan whereby Participants make contributions to the Plan ("Voluntary Contributions") and direct the Plan to purchase investments with those contributions from options pre-selected by the Plan's fiduciaries which are then allocated to Participants' individual accounts.   The Plan offered a number of equity and fixed income investment options.

27.     At all relevant times, the Bausch & Lomb Incorporated Stock Fund (the "Fund") was an investment option for Participants' Voluntary Contributions.   The Fund is comprised of investments in Bausch & Lomb common stock.

28.     The Company also made contributions to the Plan on behalf of Participants ("Employer Contributions"). According to the Plan's Form 11-K, the Company contributed "100% of the first 3% of each participant's pre-tax savings contributions plus 50 % of the next 2% of each participants pre-tax savings contributions." Effective January 1, 2005, this amount was changed to 150% of the first 5% of each Participant's pre-tax savings contributions.

29.     For all employees with at least on year of employment, including those that did not participate in the Plan, the Company also contributed to the Plan on that employee's behalf

.5% of eligible compensation. Effective January 1, 2005, this amount was increased to 2.5 % and became effective immediately upon hire.

30.     Prior to January 1, 2005, all Employer Contributions were required to be invested in the Fund until a Participant reached age 55. This restriction was removed effective January 1, 2005, after which Employer Contributions could be invested in the same way as Voluntary Contributions.

## VI. DEFENDANTS WERE FIDUCIARIES

31.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan because:

(a)     they were so named; and/or

(b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). In that regard, a person is a fiduciary even if a plan does not name him as such or by its terms assign fiduciary duties to him where by his conduct he engages in fiduciary activities. The test for whether a person (or entity) is a fiduciary is functional and based on actual conduct. Those who have control over management of a plan or plan assets are fiduciaries regardless of the labels or duties assigned to them by the language of a plan. Moreover, in order to fulfill the express remedial purpose of ERISA, the definition of "fiduciary" is to be construed broadly.

-8-

32.     A fiduciary may not avoid his fiduciary responsibilities under ERISA by relying solely on the language of the plan documents.  While the basic structure of a plan may be specified within limits by the plan sponsor, the fiduciary may not follow the plan document if to do so leads to an imprudent result under ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

33.     The Committee and its members were fiduciaries because the Committee was the Plan Administrator. Based on its status as Plan Administrator, the Committee Defendants were responsible for selecting and monitoring all Plan investments and investment options.

34.     The Director Defendants were fiduciaries of the Plan because they had the fiduciary duty to appoint and monitor the members of the Committee.  The Defendant Directors had the power and responsibility to appoint as members of the Committee persons with sufficient education, knowledge and experience to inform themselves as necessary to perform their duties as Committee members, including the duty to evaluate the merits of investment options under the Plan.   The Director Defendants also had an ongoing duty to ensure that the persons appointed to the Committee were fully informed and performing their duties properly with respect to the selection of investment options under the Plan and the investment of the assets of the Plan.

35.     Upon information and belief, Bausch & Lomb was a fiduciary in that it managed, administered and operated the Plan and Plan assets and disseminated Plan communications to Participants.  Upon information and belief, the Committee met infrequently and spent very little time on matters relating to administration of the Plan and Plan investments.  Rather, upon information and belief, these jobs were performed by Bausch & Lomb employees acting in the scope of their day to day duties and, in particular, by Bausch & Lomb human resources, legal, corporate communications, finance and treasury personnel.

36.     Moreover, the Committee members were appointed and served on the Committee as part of and in the ordinary course of their job responsibilities without any additional compensation.  Accordingly, the Company is responsible and liable for their actions.

## VII.  FIDUCIARY DUTIES UNDER ERISA

37.     **The Statutory Requirements.**  ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

38.     **The Duty of Loyalty.**  ERISA imposes on a plan fiduciary the duty of loyalty-- that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . .  providing benefits to participants and their beneficiaries . . . ."

39.     The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.   A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

40.     **The Duty of Prudence.**  Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence--that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence

-10-

under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

41.     **The Duty to Inform.**   The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: 1) a negative duty not to misinform; 2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and 3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.  These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

42.     Pursuant to the duty to inform, fiduciaries of the Plan were required under ERISA to furnish certain information to Participants.  For example, ERISA § 101, 29 U.S.C. § 1021, requires that fiduciaries furnish a SPD to Participants. ERISA § 102, 29 U.S.C. § 1022, provides that the SPD must apprise Participants of their rights under the Plan.  The SPD and all information contained or incorporated therein constitutes a representation in a fiduciary capacity upon which Participants were entitled to rely in determining the identity and responsibilities of fiduciaries under the Plan and in making decisions concerning their benefits and investment and management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or

-11-

summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b).

43.    **The Duty to Investigate and Monitor Investment Alternatives.**  With respect to a pension plan such as the Plan, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plan including employer securities, to ensure that each investment is a suitable option for the Plan.

44.    **The Duty to Monitor Appointed Fiduciaries.**  Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed.  The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries.  In a 401(k) plan such as the Plan the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

a.    possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

b.    are knowledgeable about the operations of the Plan the goals of the Plan and the behavior of Plan's participants;

c.    are provided with adequate financial resources to do their jobs;

d.    have adequate information to do their jobs of overseeing the Plan investments with respect to company stock;

e.    have access to outside, impartial advisors when needed;

-12-

    f.  maintain adequate records of the information on which they base their decisions and analysis with respect to Plan investment options; and

    g.  report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

   45.  **The Duty Sometimes to Disregard Plan Documents**.  A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

   46.  **Co-Fiduciary Liability**.  A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>   (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
>   (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
>   (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

47.  **Non-Fiduciary Liability**.  Under ERISA non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## VIII.  PARTICIPANTS ARE NOT RESPONSIBLE FOR IMPRUDENT PLAN INVESTMENTS

48.  The fact that Participants selected investments from options pre-selected by Defendants is no defense in this case.  Fiduciaries can shift liability for imprudent investments to Participants under ERISA § 404(c), 29 U.S.C. § 1104(c) only if, among other things, they meet five specific requirements:

a)  they disclose in advance the intent to shift liability to Participants;

b)  they designate the Plan as a "404(c) plan" and adequately communicate this to Participants;

c)  they ensure that Participants are not subject to undue influence;

d)  they provide an adequate description of the investment objectives and risk and return characteristics of each investment option; and

e)  they disclose to Participants all material information necessary for Participants to make investment decisions that they are not precluded from disclosing under other applicable law.  In this regard, fiduciaries have a choice B: they can disclose all material information to Participants, including information that they are not required to disclose under the securities laws, and shift liability to Participants, or they can comply with the more limited disclosure requirement under the securities laws but remain liable for imprudent investments.

29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(i) and (ii) and (c)(2)(i) and (ii).

49.  Defendants failed to shift liability to Participants for imprudent investment decisions under section 404(c) because they failed to comply with the relevant regulations.

## IX. SUBSTANTIVE ALLEGATIONS

50.     Bausch & Lomb develops, manufactures, and markets eye health products.  Its products are marketed by its sales force and sold through distributors to licensed eye care professionals and health product retailers.

51.     Throughout the Class Period, the Company reported strong fiscal results and portrayed a healthy financial outlook.  This was false because (1) the Company failed to disclose serious problems with its ReNu product and (2) failed to disclose financial improprieties resulting in false financial statements.  As a result of those material omissions and false statements, the price of the Company's stock and the price of Fund shares was artificially inflated.

### A.     Defective ReNu Product

52.     ReNU is a, "multi-purpose solution for cleaning, rinsing, disinfecting, and storing your soft contact lenses."

53.     ReNu was introduced in the third quarter of 2004.  The Company touted ReNu as the next generation contact lense solution that was clean and sterile.  The Company represented that it would rinse and disinfect lenses and kill microrganisms.

54.     The Company repeatedly represented that ReNu was contributing to and would in the future continue to contribute to the Company's financial growth and success.  In its Form 10-K for the year ended 2004 and its Forms 10-Q for the first three quarters of 2005, the Company touted repeatedly ReNu's successful marketing campaign which led to substantial growth in ReNu market share and Company sales.

55.     These statements were materially misleading in that the Company failed to disclose the substantial problems with ReNu arising out of an increase of incidents of fusarium keratitis caused by ReNu.

56.     Fusarium keratitis is a serious eye infection that can develop through the whole depth of the cornea.  Symptoms of fusarium keratitis include eye pain, eye discomfort, decrease in vision and light hypersensitivity. The infection can require prolonged drug therapy with antifungal medication.  Those infected with fusarium keratitis who do not receive or who do not respond to medical treatment may experience significant loss of vision and will usually require surgical intervention, including corneal transplantation.

57.     Upon information and belief, the Hong Kong Department of Health became aware of an increase in incidents of patients diagnosed with fusarium keratitis and requested information from the Company on this issue, as a result of which the Company knew or should have known the problems with ReNu by at least mid-2005.

58.     Singapore health officials also noticed an increase in reports of infection and discovered 39 cases involving contact lens users from 2005 to February 2006. According to a Reuters articled dated March 31, 2006, authorities in Singapore linked the incidents of fusarium keratitis to ReNu.

59.     According to a Morningstar article dated March 31, 2006, ReNu is the only lens care solution to have been identified by Asian officials as the cause of the increase in incidents of fusarium keralitis: "no other contact-lens solution has been singled out."

60.     In response to ReNu being singled out as the cause for the increase in incidents of fusarium keratitis in Asia and requests by Asian officials to pull the product from the shelves, Bausch & Lomb suspended sales of ReNu in Hong Kong and Singapore in February 2006.

-16-

61.    Despite the fact that Bausch & Lomb suspended sales of ReNu in February 2006, Singapore's Ministry of Health issued a press release in April 2006 stating the following in relevant part:

> There has been an additional 36 cases of fungal corneal infection reported since the last update in late February (39 cases). In total, 75 cases of fungal corneal infection (which tested positive for Fusarium) with a history of contact lens use have been reported for the period from 1 Nov 2004 to 12 April 2006. This compares with two reported cases from 1 Jan to 31 Oct 2004.
>
> In view of the potentially serious adverse visual consequences of fungal corneal infection, the Ministry of Health had on 17 Feb 2006 advised all contact lens users as a precautionary measure to discontinue the use of Bausch and Lomb's ReNu multipurpose contact lens solution for the time being, until the causes behind this recent increase in infections can be more clearly ascertained.

* * *

> A comprehensive case-control study (comparing contact lens users with infection and contact lens users without corneal infection) was undertaken in Feb-Mar 2006 to investigate risk factors for the spike in fungal corneal infection. The study found a strong association between corneal infection and the use of ReNu solution. This association remained strong even after taking into consideration socio-demographic, lens, hygiene and environmental factors. The findings are also consistent with recent observations made in the US and Hong Kong.

62.    On March 8, 2006, the United States Centers for Disease Control and Prevention ("CDC") received a report from an ophthalmologist in New Jersey regarding three patients, all soft-contact lens users, who had been diagnosed with fusarium keratitis.

63.    According to the CDC, in addition to those incidents reported by the New Jersey ophthalmologist, "initial contact with several corneal disease specialty centers in the United States have also seen recent increases in fusarium keratitis."

64.    In a report dated April 10, 2006, entitled "Fusarium Keratitis — Multiple/States, 2006," the CDC stated that as of April 9, 2006, 109 cases of suspected fusarium keratitis are

under investigation by CDC and public health authorities in 17 states of the U.S. including California, Connecticut, Florida, Georgia, Iowa, Maryland, Massachusetts, Michigan, Missouri, New Jersey, New York. North Dakota, Ohio, Pennsylvania, Tennessee, Texas and Vermont.

65.     Out of the 109 cases, 30 have been fully investigated. Out of the 30 fully investigated cases, 28 of the patients wore soft contact lenses. Out of those 28, a staggering 26 patients used ReNu. The number of suspected or confirmed cases has risen to 186 in 29 states.

66.     ReNu, upon information and belief, contains a defect in its chemical composition, which is either inherent to ReNu itself or results from contaminants found in the facility at which it is manufactured. Upon information and belief, this defect causes fusarium keratitis.

67.     On or about April 10, 2006, the U.S. Food and Drug Administration (FDA) and the CDC issued a press release, "alerting health care professionals and their patients who wear soft contact lenses to an increasing number of reports in the United States of rare but serious fungal infections in the eye that can cause permanent loss of sight." The press release indicated further that, "[s]ome patients have reported a significant loss of vision, resulting in the need for a corneal transplant." The FDA indicated that a fungus called Fusarium was identified as the cause of the reported infections.

68.     Thereafter, Bausch & Lomb announced the suspension of shipments of ReNu due to reports of fusarium keratitis infections in contact lens wearers who used ReNu.

69.     On or about April 13, 2006, Bausch & Lomb requested that U.S. retailers remove ReNu from their shelves, and recommended that consumers switch to another lens care solution until the conclusion of the investigation into reports of fungal keratitis infections among contact lens wearers in the United States. On April 14, 2006, the FDA issued a statement supporting Bausch & Lomb's decision to withdraw ReNu from the market during the pending investigation.

70.     On May 15, 2006, Bausch & Lomb permanently recalled all ReNu products in all countries in light of the increased risk of infection and possible blindness.

71.     Defendants knew or should have known of the problems with ReNu and, therefore, should have disclosed those problems.

**B.     Financial Irregularities and False Financial Statements**

72.     On October 26, 2005, the Company issued a press release announcing preliminary third quarter results.   The results were effected by what the Company termed as charges associated with an ongoing investigation related to Brazilian subsidiary.  The results were also of a preliminary nature pending the outcome of an ongoing investigation "into allegations of improper conduct by management of the Company's Brazilian subsidiary, BL Industria Otica, Ltda. ("BLIO"), and past tax assessments against BLIO by Brazilian taxing authorities."  The Company's audit committee found the general manager, controller and other employees of BLIO failed to properly account for about $600,000 in expenses.

73.     Shortly thereafter, the Company disclosed that the Securities and Exchange Commission (the "SEC") was conducting an informal inquiry into the matter and Brazilian tax authorities have also said the unit owes $5 million in taxes and $21 million in penalties.

74.     On December 22, 2005, after the markets closed, the Company provided an update on its internal investigation of the Brazilian subsidiary and announced that it will restate its financial results for 2000 through the first half of 2005. The press release issued by the Company stated in part:

> Bausch & Lomb today provided an update on the investigation, previously reported on October 26, 2005, into allegations of improper conduct by management of its Brazilian subsidiary, BL Industria Otica Ltda. (BLIO) and tax assessments against BLIO by Brazilian taxing authorities that related to several prior years. The Company has concluded, based on the investigation, that certain

prior-period financial statements will be required to be restated. In addition, the Company has preliminarily identified a material weakness in its controls over financial reporting relating to detection and prevention of local management's fraudulent override of Brazil tax reporting controls. Bausch & Lomb also announced today that the Audit Committee of its Board of Directors has commenced an independent investigation into revenue recognition practices in its Korean subsidiary. Information provided on each of these matters is presented below.

Brazil Matters

On October 26, 2005, the Company reported preliminary results of operations for the third quarter and nine months ended September 24, 2005, pending the results of an investigation into allegations of improper conduct by management of the Company's Brazilian subsidiary, BL Industria Otica Ltda., and past tax assessments against BLIO by Brazilian taxing authorities. BLIO accounted for approximately $20 million in net sales in 2004, which is less than one percent of Bausch & Lomb's consolidated revenues.

As described in the October 26 release, in September of 2005, the Audit Committee of the Board of Directors commenced an independent investigation into allegations of misconduct by the management of BLIO, which had been reported to the Company's senior management by a BLIO employee pursuant to the Company's established compliance program. The Audit Committee engaged the law firm of Cahill Gordon & Reindel LLP to assist with the investigation. Bausch & Lomb also voluntarily reported these matters to the staff of the Northeast Regional Office of the Securities and Exchange Commission, which commenced an informal inquiry into the matter.

The Audit Committee's independent investigation determined that the general manager, the controller and other employees of BLIO, in violation of Company policies, engaged in improper management and accounting practices, including, among other things, the mischaracterization of approximately $600,000 in expenses to fund an approximately $1.5 million unauthorized local pension arrangement for the benefit of themselves and other members of local management, the avoidance of Brazilian payroll tax obligations, and the misuse of Company assets for personal benefit. As noted in the October 26 release, Bausch & Lomb has terminated the employment of the BLIO general manager and BLIO controller.

Also as a result of the Audit Committee's investigation, it was learned that certain Brazilian tax authorities have made tax assessments relating to or arising from Brazilian VAT, social contribution, income and certain import-related taxes against BLIO for unpaid taxes totaling approximately $5 million, interest of approximately $7 million, plus approximately $21 million in claimed penalties

which relate back to various earlier periods. These assessments include approximately $19 million in penalties arising from tax-credit transactions involving BLIO and third parties, alleged by Brazilian tax authorities to have been fraudulently structured and implemented. Appropriate reserves relating to these assessments were not reflected by BLIO in its subsidiary financial statements, as required by the Company's established policies and procedures. In its October 26 release, the Company indicated that, based on its assessments, in consultation with outside tax counsel, of the outstanding Brazil tax matters, it was recording a reserve in the Company's third quarter financial statement of approximately $22 million, yielding an after-tax charge of $19.6 million. The Company also cautioned in the October 26 release that there could be no assurance that the reserve for these tax matters would not be required to be materially increased or recorded in a different period.

* * *

The Audit Committee's investigation of the BLIO matters is substantially complete. On December 22, 2005, the Board of Directors, on recommendation of the Audit Committee and management, concluded that the Company should restate certain previously issued financial statements, as described below.

Restatement of Financial Information

The Company expects to restate its financial results for the fiscal years ended 2000, 2001, 2002, 2003, 2004, as well as the first and second quarters of 2005. Accordingly, the financial statements contained in the following Company filings with the Securities and Exchange Commission should no longer be relied upon:

- Annual Report on Form 10-K for the year ended December 25, 2004;

- Quarterly Report on Form 10-Q for the quarterly period ended March 26, 2005; and

- Quarterly Report on Form 10-Q for the quarterly period ended June 25, 2005

## C.    The Fund and Bausch & Lomb Stock Were Artificially Inflated

75.    In response to the revelations detailed above concerning ReNu and the Company's accounting, the Company's shares plummeted from a Class Period high of over $80 per share to almost $40 per share.

76.     As a result of the failure to disclose the problems with ReNu and the fact that the Company's previously announced financial statements were, by the Company's own admission and restatement, false and misleading, Bausch & Lomb's stock price and the price of Fund shares were artificially inflated during the Class Period and thus an imprudent retirement investment.

77.     The Company's top executives took advantage of the artificial inflation and sold over $29 million worth of Company stock during the Class Period, as follows:

| Executive | Position | Shares Sold | Proceeds |
|---|---|---|---|
| Ronald L. Zarrella | Chief Executive Officer | 75,100 | $5.7 million |
| Stephen C. McCluski | Chief Financial Officer | 30,439 | $2.4 million |
| John M. Loughlin | Regional Vice President | 71,482 | $5.4 million |
| Dwain L. Hahs | Vice President of Global Operations | 15,320 | $1.1 million |
| Angela J. Panzarella | Vice President | 1,710 | $123,380 |
| Robert B. Stiles | Senior Vice President and General Counsel | 38,082 | $2.9 million |
| Kamal Sarbadhikari | Vice President of the Company's Regulatory and Quality Affairs | 37,100 | $2.8 million |
| Geoffrey F. Ide | Regional Vice President | 31,000 | $2.3 million |
| William H. Waltrip | Lead Director and former Chairman of the Board | 90,292 | $6.9 million |
| **TOTAL** | | | **$29.6 million** |

78.     Thus, while the Company's stock was artificially inflated and insiders were selling their stock for personal gain, Defendants permitted the Plan to invest in the Fund and the Fund to invest in Bausch & Lomb stock.

## COUNT I:
## Imprudent Investment (Against the Company and the Committee Defendants)

79.     Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

80.     This Count is asserted against Bausch & Lomb and the Committee Defendants.

81.     Bausch & Lomb and the Committee Defendants as a result of their positions with or in relation to Bausch & Lomb knew or should have known of the undisclosed material adverse information alleged above and knew or should have known that the price of Fund shares was artificially inflated and that the Fund was an imprudent investment.

82.     Despite the fact that they should have known that the Fund was not a prudent investment, Defendants breached their fiduciary duties by: (a) offering the Fund as an investment option for the Plan; (b) permitting the Plan to purchase shares of the Fund; (c) permitting the Plan to maintain its investments in the Fund; and (d) permitting the Fund to invest in Bausch & Lomb stock.

83.     Because Defendants should have known that the Fund was not a prudent investment option throughout the Class Period, they should have terminated the Fund as an investment option, halted the purchase of shares of the Fund, sold all of the Plan's shares in the Fund, sold all of the Fund's shares of Bausch & Lomb stock and made full disclosure of all material information to Participants.

84.     To the extent that Defendants possessed material adverse nonpublic information, they should have prevented the Plan from purchasing additional shares in the Fund.  They should also have directed the Plan to sell all of their shares in the Fund and disclosed this nonpublic

information prior to any sales by the Plan. Had they done so, the Plan would have limited its losses substantially, even though the price might have dropped somewhat upon disclosure.

85.     As a consequence of Defendants' breaches, the Plan suffered losses.

86.     Each Defendant is liable for the acts of the other Defendants as a co-fiduciary. Upon information and belief, each defendant (a) knowingly participated in, or knowingly undertook to conceal the breaches of the other fiduciaries, (b) by virtue of his own breach of fiduciary duty, enabled the other defendants to breach their fiduciary duties, and/or (c) had knowledge of the other defendants' breaches and failed to take reasonable steps to remedy them.

87.     Defendants are liable to personally make good to the Plan any losses to the Plan resulting from each breach under 29 U.S.C. § 502(a)(2).

88.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to the Class.

## COUNT II:
### Failure To Disclose (Against the Company and Committee Defendants)

89.     Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

90.     This Count is asserted against Bausch & Lomb and the Committee Defendants.

91.     Defendants had a duty to provide to Participants complete, accurate and material information concerning the problems with ReNu and Bausch & Lomb's financial condition necessary for Participants to make informed decisions concerning the prudence of directing the Plan to invest in the Fund.

92.     Defendants failed to disclose complete and accurate information as alleged above.

-24-

93.    As a consequence of the foregoing negligent nondisclosures and negligent misrepresentations, Defendants breached their fiduciary duties in that they failed to provide Participants with an adequate description of the risk and return characteristics of the Fund.

94.    As a consequence of the Defendants' breaches, the Plan suffered losses.

95.    Each Defendant is liable for the acts of the other Defendants as a co-fiduciary. Upon information and belief, each defendant (a) knowingly participated in, or knowingly undertook to conceal the breaches of the other fiduciaries, (b) by virtue of his own breach of fiduciary duty, enabled the other defendants to breach their fiduciary duties, and/or (c) had knowledge of the other defendants' breaches and failed to take reasonable steps to remedy them.

96.    Defendants are liable to personally make good to the Plan any losses to the Plan resulting from each breach under 29 U.S.C. § 502(a)(2).

97.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to the Class.

## COUNT III:
### Failure To Appoint and  Monitor (Against the Director Defendants)

98.    Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

99.    This Count is asserted against the Director Defendants.

100.    As alleged above, the Director Defendants assumed a duty to monitor the performance of other fiduciaries through their responsibility to appoint and remove those fiduciaries

101.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and

holding of Plan assets, and must take prompt and effective action to protect the Plan and Participants when they are not.

102.   The monitoring duty further requires that appointing fiduciaries have procedures in place, so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the Plan's performance, and by ensuring that the monitored fiduciaries have an appropriate process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

103.   Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in his/her possession that he/she knows, or reasonably should know, that the monitored fiduciaries must have in order to prudently manage the Plan and Plan assets, or that may have an extreme impact on the Plan and the fiduciaries' investment decisions regarding the Plan.

104.   The Director Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plan's investment in the Fund, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to company stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of the undisclosed material adverse information and the likely impact of such information on the value of the Plan's investment in the Fund; (c) to the extent any appointee lacked such information, failing to provide complete and accurate

-26-

information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets; and (d) failing to remove appointees whose performance was inadequate in that they continued to make and maintain huge investments in the Fund, despite their knowledge of misrepresentations and nondisclosures that rendered the Fund an imprudent investment during the Class Period for Participants' retirement savings in the Plan.

105.    As a consequence of the Committee Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Committee Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

106.    Each Defendant is liable for the acts of the other Defendants as a co-fiduciary. Upon information and belief, each defendant (a) knowingly participated in, or knowingly undertook to conceal the breaches of the other fiduciaries, (b) by virtue of his own breach of fiduciary duty, enabled the other defendants to breach their fiduciary duties, and/or (c) had knowledge of the other defendants' breaches and failed to take reasonable steps to remedy them.

107.    Defendants are liable to personally make good to the Plan any losses to the Plan resulting from each breach under 29 U.S.C. § 502(a)(2).

108.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A. An Order certifying the instant action as a class action under Fed. R. Civ. P. 23, appointing Plaintiff as class representative, and determining that Plaintiff's counsel satisfies the prerequisites of Rule 23(g);

B. A Declaration that Defendants breached ERISA fiduciary duties owed to the Plan and Participants;

C. A Declaration that Defendants are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D. An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

E. Imposition a Constructive Trust on any amounts by which Defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

F. An Order enjoining Defendants from any further violations of their ERISA fiduciary obligations;

G. An Order that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in the Fund maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price of the Fund;

H. An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.


DATED:      May 25, 2006
            New York, New York


                            Respectfully submitted,

                            **SARRAF GENTILE LLP**


                            Ronen Sarraf (RS-7694)
                            Joseph Gentile
                            485 Seventh Avenue, Suite 1005
                            New York, NY 10018
                            Telephone: (212) 868-3610
                            Facsimile: (212) 918-7967

                            Robert A. Izard, Jr.
                            Wayne T. Boulton
                            **SCHATZ & NOBEL, P.C.**
                            20 Church Street, Suite 1700
                            Hartford, CT 06103
                            Telephone: (860) 493-6292
                            Facsimile:  (860) 493-6290

                            **Attorneys for Plaintiff and the Class**